**CLEANOX ENVIRONMENTAL SERVICES, INC., Plaintiff,**

v.

**HUDSON ENVIRONMENTAL SERVICES, INC., et al., Defendants.**

No. CIV.A. 96–5754(AJL).

United States District Court, D. New Jersey.

May 27, 1998.

Steven J. Madonna, William R. Benvenuto, Law Offices of Steven J. Madonna, Chatham, for Plaintiff and Third Party Defendants Cleanox Environmental Services, Inc.

Thomas H. Shunk, Lisa Hammond Johnson, Baker & Hostetler, LLP, Cleveland, OH, for Plaintiff and Third Party Defendants Cleanox Environmental Services, Inc.

Roger Balog, Houston, TX, for Plaintiff and Third Party Defendants Cleanox Environmental Services, Inc.

Ronald E. Wiss, Adam K. Derman, Wolff & Samson, P.A., Roseland, for Defendants Hudson Environmental Services, Inc., James T. Wilson, Andrew Kondracki and Geo–Cleanse International, Inc.

Joseph S. Presta, Kerman, Stowell, Kondracki & Clarke, P.C., Falls Church, VA, for Defendants Hudson Environmental Services, Inc., James T. Wilson, Andrew Kondracki and Geo–Cleanse International, Inc.

## OPINION

LECHNER, District Judge.

This case concerns a dispute over a method and system for the remediation of groundwater contamination. Plaintiff, Cleanox Environmental Services, Inc. ("Cleanox"), brought suit against the defendants, Hudson Environmental Services ("Hudson Environmental Services"), James T. Wilson ("Wil-

son"), Andrew Kondracki ("Kondracki"), Geo–Cleanse International, Inc. ("Geo–Cleanse"), Gerard K. Donnelly ("Donnelly"), and John Doe(s) A–Z ("John Doe(s) A–Z") (collectively, the "Defendants").

Cleanox commenced this action on 11 December 1996 by filing a seven count complaint (the "Complaint") and jury demand. The Complaint alleged patent infringement, inducement to infringement, trademark infringement, false designation of origin and false description, breach of confidentiality agreements, interference with confidentiality agreements and conspiracy. *See* Complaint at 11–18, ¶¶ 27–46.

On 6 February 1997, Defendants Hudson Environmental, Geo–Cleanse, Kondracki, and Wilson filed an answer to the Complaint (the "Hudson Environmental Answer") and asserted a counterclaim against Cleanox for declaratory judgment, alleging interference with prospective economic relations and interference with contractual relations. *See* Hudson Environmental Answer at 17–23, ¶¶ 17–42.

On 18 February 1997, Geo–Cleanse filed a third-party complaint ("Third–Party Complaint") against Ronald Vigneri ("R.Vigneri") and Mark Vigneri (collectively, "the Vigneries") for declaratory judgment, alleging tortious interference with prospective economic relations and tortious interference with con-

tractual relations. *See* Third–Party Complaint at 3, ¶ 7.

This opinion concerns the question of the construction of Claim 1 of Patent Number 5,286,141 (the " '141 Patent") ("Claim One of the '141 Patent") and Claim 1 of Patent Number 5,520,483 (the " '483 Patent")[1] ("Claim One of the '483 Patent") pursuant to *Markman v. Westview Instruments,* 52 F.3d 967 (Fed.Cir.1995) (en banc), *aff'd,* 517 U.S. 370, 116 S.Ct. 1384, 134 L.Ed.2d 577 (1996).[2] The following issues are disputed by the parties: (1) the meaning of the term "well" in Claim One of the '141 Patent and Claim One of the '483 Patent, (2) whether step b of Claim One of the '141 Patent requires that pH be monitored for a particular purpose, (3) whether the term "treating flow" in step (c) of Claim One of the '141 Patent requires a "pressure limitation" and permits "bioremediation" and (4) whether Claim One of the '483 Patent requires that each of its steps be performed separately and sequentially in order to practice the invention.

On 14 October 1997, a *"Markman* hearing" (the *"Markman* Hearing") was conducted concerning the disputed issues following jury selection and before opening statements.[3] At the *Markman* Hearing, one witness, John Loper, testified on behalf of Cleanox. The Defendants also had one witness, James Wil-

---

1. The '483 Patent resulted from a "continuation-in-part application filed in the application resulting in the '141 Patent." Brief—Defendants at 16–17 n. 3.

2. In support of its construction of Claim One of the '141 Patent and Claim One of the '483 Patent, Cleanox submitted: Cleanox's "Markman" Brief in Support of Request for Jury Charge Regarding Claim Interpretation, with Exhibits A through D attached ("Brief—Cleanox"); and Plaintiff's Reply Brief Regarding "Markman" Issues ("Reply Brief—Cleanox").

 In support of their construction of Claim One of the '141 Patent and Claim One of the '483 Patent, Defendants submitted: Defendants' Brief on Claim Construction, with Exhibit A through D attached ("Brief—Defendants"); and Defendants' Reply Brief on Claim Construction ("Reply Brief—Defendants").

3. In a 6 October 1997 letter to counsel (the "Court's Letter"), it was stated that, in connection with claim construction issues, it seemed appropriate for the parties to establish the art

practiced by the invention and the qualifications of a person ordinarily skilled in that art. It was suggested that this data be presented at a hearing.

Counsel for Cleanox responded to the Court's Letter in an 8 October 1997 letter (the "Cleanox 8 October 1997 Letter") and stated, in his view, the "claim interpretation issues can be resolved by the Court without resort to extrinsic evidence." Counsel for Cleanox also stated, however, that "because the claim interpretation issues is [sic] of great importance to the overall conduct of the case, the plaintiff welcomes the opportunity to address the Court regarding the Markman issues in a hearing...immediately prior to jury selection." *Id.*

The Defendants, in their own 8 October 1997 letter (the "Defendants 8 October 1997 Letter"), stated they "do not believe that an evidentiary hearing is necessary." Defendants also stated, however, that if the court "believes testimony on specific issues would be helpful, we are willing to proceed with the hearing." *Id* .

son, testify on their behalf. Loper and Wilson provided conflicting testimony.

At the conclusion of the *Markman* Hearing, the construction of the claims was set out on the record.[4] After doing so, counsel were advised that the testimony of Loper and Wilson was accepted only for the purpose of background in the technical area at issue. *See Markman* Hearing Transcript at 78:5–17. Moreover, counsel were informed that, in reaching the decision, only the intrinsic evidence contained in the public record was used.[5] *See Markman* Hearing Transcript at 78:11–17. Following the *Markman* Hearing and the filing of a letter-opinion, dated 12 December 1997, (the "12 December 1997 Letter–Opinion") counsel for the Defendants wrote to the court and requested clarification of two issues. *See* Letter from counsel for the Defendants, dated 18 December 1997 (the "18 December 1997 Letter"). Accordingly, this supplemented opinion (the "Supplemented Opinion") addresses those issues as well as the issues contained in the 12 December 1997 Letter–Opinion; this, the Supplemented Opinion, supercedes the 12 December 1997 Letter–Opinion.

For the reasons discussed below and during the *Markman* Hearing, the term "well" in Claim One of the '141 Patent and in Claim One of the '483 Patent is construed as "a structure used for both monitoring and injecting the groundwater." Step b of Claim One of the '141 Patent is read to require that pH be monitored for the particular purpose of determining the existence of acceptable continuity and well interflow paths. The term "treating flow" in step (c) of Claim One of the '141 patent is read not to have a pressure limitation associated with it and to be limited to the "chemical remediation" method. Finally, Claim One of the '483 Patent is read to require that each of its steps be performed separately and sequentiality in order to practice the invention.

## FACTS

### A. Background

The '141 Patent and the '483 Patent describe a system for the remediation of groundwater[6] contamination.[7] Many methods for removing contaminants through groundwater remediation have been devel-

4. Pursuant to Rule 52.1 of the Local Rules for the United States District Court for the District of New Jersey, the option to amend or supplement the oral opinion was expressly reserved at the *Markman* Hearing. *See Markman* Hearing Transcript at 77:9–11; 139:25–140:18. Accordingly, after Cleanox filed a Notice of Appeal on 6 November 1997 and the Defendants filed a Notice of Cross–Appeal on 19 November 1997, an opinion was prepared.

5. After counsel had an opportunity to consider the rulings on the claim construction issues, the parties agreed to resolve the entire action. *See Markman* Hearing Transcript at 137:11–13. Specifically, the parties agreed all Cleanox claims, other than for patent infringement, would be dismissed with prejudice. They also agreed the Geo–Cleanse third party complaint against the Vigneries and all of the counterclaims, except the one alleging the invalidity of the patents, would be dismissed with prejudice. *See id.* at 137:17–20 and 139:2–7; *see also* Final Order and Judgment. In addition, the parties stipulated that, in light of the *Markman* rulings, summary judgment of non-infringement on all of the patent claims should be entered against Cleanox and in favor of the Defendants, with each party preserving the right to raise the *Markman* issues on appeal. *See id.* at 137:21–138:2; *see also* Final Order and Judgment. Finally, the parties agreed that, if, after an appeal, the Feder-

al Circuit remanded the action, they would not seek a different venue for the action but would consent to having the case before this court. *See id.* at 138:2–18. At that time, the Cleanox patent infringement claims would be maintained only against the corporate defendants and not the individual defendants. The parties also agreed that any other disputes regarding the other claims of the '141 Patent and the '483 Patent would be brought before this court. *See id.* at 138:20–139:1.

6. Groundwater is located directly beneath two layers of the earth's matter. The first layer is a layer of moist soil. Beneath this soil is a relatively dry region, known as the "vadose zone" or "unsaturated zone," where the space between the rock particles (clay, sand, and/or gravel) is filled with air. Groundwater exists directly below the vadose zone in an area called the "groundwater region" or "saturated zone." Groundwater is replenished by precipitation seeping from the earth's surface through the vadose zone into the groundwater region.

7. Much of the groundwater supply has been contaminated as a result of increasing population and industrialization. Examples of contaminants are oil and gas from leaking underground tanks at active or abandoned gas stations, and a variety of chemical contaminants that have been dumped into the earth as industrial waste.

oped and used over the years. The type of treatment necessary to perform the remediation depends upon a variety of factors, including the type of contaminant, its location and the geologic conditions at the site.

### B. *The '141 Patent and the '483 Patent*

Cleanox owns two patents for inventions developed by R. Vigneri for the remediation of certain groundwater contamination. *See* Amended Complaint at 3, ¶ 12. The '141 Patent was filed 12 February 1993 and was issued 15 February 1994. *See* '141 Patent. The '483 Patent was filed 10 February 1994 and was issued 28 May 1996. *See* '483 Patent.

Both patents describe their processes as "[a] method for remediating a hydrocarbon-contaminated region of a subterranean body of groundwater to destroy or reduce the initial levels of hydrocarbon contaminants." '141 Patent at col. 8, lines 23–26; '483 Patent at col. 9, lines 33–35. The two patents rely upon the interaction of hydrogen peroxide and the hydrocarbon contaminants to alleviate the harm caused by groundwater contaminants.

Claim One of the '141 Patent provides as follows:

1. A method for remediating a hydrocarbon-contaminated region of a subterranean body of groundwater to destroy or reduce the initial concentration levels of hydrocarbon contaminants, comprising the steps of:

(a) providing a *plurality* of mutually spaced *wells* intersecting said groundwater region ("Step A of the '141 Patent");

(b) *determining the existence* of acceptable continuity and *well interflow paths* for the said region by *generating a test flow* of a solution of hydrogen peroxide *from one of said wells* and *monitoring pH changes at each other of said wells* as a function of time to detect a pH drop of at least 0.2 ("Step B of the '141 Patent"); and

(c) subsequent to detecting said pH drop, providing a *treating flow* of said hydrogen peroxide solution from one or more of said wells ("Step C of the '141 Patent").

Claim One of the '141 Patent (emphasis added).

Claim One of the '483 Patent provides as follows:

1. A method for remediating a hydrocarbon-contaminated region of a subterranean body of groundwater to destroy or reduce the initial concentration levels of hydrocarbon contaminants, comprising the steps of:

(a) providing a plurality of mutually spaced wells intersecting said groundwater region ("Step A of the '483 Patent");

(b) providing a treating flow of acetic acid from one or more of said wells into said groundwater region, to establish acidic conditions therein ("Step B of the '483 Patent");

(c) introducing a turbulent flow of an aqueous solution of ferrous ion into said groundwater region, *for mixing with said acidified* groundwater, thereby providing a catalyst for disassociation of hydrogen peroxide ("Step C of the '483 Patent"); and

(d) *providing a treating flow of hydrogen peroxide solution* from one or more of said wells into said groundwater region, said hydrogen peroxide undergoing a Fenton-like reaction in the presence of *said acidic conditions* and said ferrous ion to generate hydroxyl free radicals for oxidizing said contaminants ("Step D of the '483 Patent").

Claim One of the '483 Patent (emphasis added).

### LEGAL STANDARD

#### A. *Patent Infringement Generally*

 In a patent infringement action, a two-step analysis must be conducted. *Cybor Corp. v. FAS Technologies, Inc.*, 138 F.3d 1448, 1454, (Fed.Cir.1998) (in banc); *CVI/ Beta Ventures, Inc. v. Tura LP*, 112 F.3d 1146, 1152 (Fed.Cir.1997), *cert. denied,* —— U.S. ——, 118 S.Ct. 1039, 140 L.Ed.2d 105 (1998); *Cole v. Kimberly–Clark Corp.*, 102 F.3d 524, 528 (Fed.Cir.1996)), *cert. denied,* —— U.S. ——, 118 S.Ct. 56, 139 L.Ed.2d 20 (1997); *Markman,* 52 F.3d at 976 (citing *Read Corp. v. Portec, Inc.*, 970 F.2d 816, 821 (Fed.Cir.1992)); *Phillips Electronics*

*North America Corp. v. Universal Electronics Inc.*, 930 F.Supp. 986, 997 (D.Del.1996). First, the meaning and scope of the patent claims asserted to be infringed must be determined. *See Markman v. Westview Instruments*, 517 U.S. 370, 384, 116 S.Ct. 1384, 134 L.Ed.2d 577 (1996); *Cybor Corp.*, 138 F.3d at 1454; *CVI/Beta Ventures*, 112 F.3d at 1152; *Cole*, 102 F.3d at 528; *Markman*, 52 F.3d at 976. This step is commonly referred to as "claim construction" or "claim interpretation." [8] *Markman*, 52 F.3d at 976. Second, the properly construed claims must be compared to the device or method that is accused of infringing. *See Cybor Corp.*, 138 F.3d at 1454; *Markman*, 52 F.3d at 976.

As mentioned, the only issue *sub judice* is the question of the construction of Claim One of the '141 Patent and Claim One of the '483 Patent. Accordingly, only step one of the infringement analysis, i.e., claim construction, is discussed in this, the Supplemented Opinion.

### B. *Claim Construction*

A patent is a fully integrated document; it must set out a written description of the invention "in such full, clear, concise, and exact terms as to enable any person skilled in the art to which it pertains" to practice the invention. 35 U.S.C. § 112. "It has long been understood that a patent must describe the exact scope of an invention and its manufacture to 'secure to [the patentee] all to which he [or she] is entitled, [and] to apprise the public of what is still open to them.'" *Markman*, 517 U.S. at 373, 116 S.Ct. 1384.

■ The interpretation and construction of a patent claim are "exclusively within the province of the court." *Markman*, 517 U.S. at 391, 116 S.Ct. 1384; *see Cybor Corp.*, 138 F.3d at 1454; *CVI/Beta Ventures*, 112 F.3d at 1152. A court therefore has "the power and obligation to construe as a matter of law the meaning of language used in the patent claim." *Markman*, 52 F.3d at 979; *see Exxon Chem. Patents, Inc. v. Lubrizol Corp.*, 64 F.3d 1553, 1556 (Fed.Cir.1995), *cert. denied*, 518 U.S. 1020, 116 S.Ct. 2554, 135 L.Ed.2d 1073 (1996); *CVI/Beta Ventures*, 112 F.3d at

1152. When performing such an analysis, various sources may be consulted, including those that are intrinsic and extrinsic to the patent claims. *See Cybor Corp.*, 138 F.3d at 1454; *Lubrizol*, 64 F.3d at 1556; *Vitronics Corp. v. Conceptronic, Inc.*, 90 F.3d 1576, 1582–83 (Fed.Cir.1996); *CVI/Beta Ventures*, 112 F.3d at 1152; *Markman*, 52 F.3d at 979–80.

■ There is a hierarchy of evidence which must be considered with the emphasis given first to the words of the claims, then to the specification of the patent, then to the prosecution history of the patent and finally to extrinsic evidence. *Vitronics*, 90 F.3d at 1582; *see Cybor Corp.*, 138 F.3d at 1454 (majority opinion) and *Cybor Corp.*, 138 F.3d at 1462 (Plager, J. concurring); *Lubrizol*, 64 F.3d at 1556. Despite this hierarchy, a court nevertheless may properly decide to hear all proffered evidence prior to construing the claims, provided it does not accord any weight to extrinsic evidence that is inconsistent with the intrinsic evidence. *Vitronics*, 90 F.3d at 1584; *see also Cybor Corp.*, 138 F.3d at 1454 (majority opinion) and *Cybor Corp.*, 138 F.3d at 1475 (Rader, J. dissenting).

### 1. *Intrinsic Evidence*

■ The intrinsic evidence of the public record must first be examined when construing the meaning of a patent claim. *See Vitronics*, 90 F.3d at 1582. Such evidence is "the most significant source of the legally operative meaning of disputed claim language." *Id.* Reliance on intrinsic evidence enables individuals to review the public record, apply the established rules of claim construction, ascertain the scope of the claimed invention and, then, design around the claimed invention.

■ Intrinsic evidence includes (1) the claims of the patent, (2) the specifications of the patent and (3) the prosecution history of the patent. *See Cybor Corp.*, 138 F.3d at 1466–67 (Mayer, C.J.concurring); *Vitronics*, 90 F.3d at 1582; *see also Quantum Corp. v.*

---

**8.** For purposes of consistency, the term "claim construction" will be used throughout this opinion when referring to the first step in an infringement analysis.

*Rodime, PLC,* 65 F.3d 1577, 1580 (Fed.Cir. 1995), *cert. denied,* 517 U.S. 1167, 116 S.Ct. 1567, 134 L.Ed.2d 666 (1996); *Markman,* 52 F.3d at 979. In most instances, an analysis of the intrinsic evidence alone will resolve any asserted ambiguity in a disputed claim term. *Markman,* 517 U.S. at 389, 116 S.Ct. 1384; *Vitronics,* 90 F.3d at 1583.

#### a. The Claims

Section 112 of Title 35 of the United States Code requires a patent specification "conclude with one or more claims [9] particularly pointing out and distinctly claiming the subject matter which the applicant regards as his [or her] invention." 35 U.S.C. § 112. The claims of the patent define "the precise scope of the patent." *Lucas Aerospace, Ltd. v. Unison Indus., L.P.,* 890 F.Supp. 329, 332 (D.Del.1995) (citing *Autogiro Co. of Am. v. United States,* 181 Ct.Cl. 55, 384 F.2d 391, 395 (1967)).

When interpreting a claim, the words of the claim itself are first considered "to define the scope of the patented invention." *Vitronics,* 90 F.3d at 1582 (citing *Bell Communications Research, Inc. v. Vitalink Communications Corp.,* 55 F.3d 615, 620 (Fed.Cir.1995)). The words are interpreted in accordance with their ordinary meaning, as understood by a person reasonably skilled in the art. *See Quantum,* 65 F.3d at 1580; *Vitronics,* 90 F.3d at 1582; *Intellicall, Inc. v. Phonometrics, Inc.,* 952 F.2d 1384, 1387 (Fed.Cir.1992); *Envirotech Corp. v. Al George, Inc.,* 730 F.2d 753, 759 (Fed.Cir. 1984); *Phillips Electronics North America Corp. v. Universal Electronics Inc.,* 930 F.Supp. 986, 997 (D.Del.1996) (citing *Loctite Corp. v. Ultraseal, Ltd.,* 781 F.2d 861, 867 (Fed.Cir.1985)).

Technical terms should be construed from the perspective of a person experienced in the field of the invention.[10] *See CVI/Beta Ventures,* 112 F.3d at 1153 (quoting *Hoechst Celanese Corp. v. BP Chemicals, Ltd.,* 78 F.3d 1575, 1578 (Fed.Cir.1996)). A claim should not be construed in a manner that renders the claim language "meaningless or superfluous." *Lucas Aerospace,* 890 F.Supp. at 332 (citing *Texas Instruments, Inc. v. United States Int'l Trade Comm'n,* 988 F.2d 1165, 1171 (Fed.Cir.1993)).

If the inventor has used a term in a manner other than its ordinary meaning, that meaning should be given effect because the inventor is free to be his or her own lexicographer. *See Vitronics,* 90 F.3d at 1582 (citing *Hoechst Celanese Corp. v. BP Chemicals, Ltd.,* 78 F.3d 1575, 1578 (Fed.Cir. 1996)); *see also Markman,* 52 F.3d at 980; *accord Hormone Research Found., Inc. v. Genentech, Inc.,* 904 F.2d 1558, 1563 (1990); *ZMI Corp. v. Cardiac Resuscitator Corp.,* 844 F.2d 1576, 1580 (Fed.Cir.1988). Any term given a special meaning, however, must be so defined in the specification or its definition must be clear by implication. *See Markman,* 52 F.3d at 980; *accord Vitronics,* 90 F.3d at 1582.

#### b. The Specification

The patent claims "must be read in view of the specification, of which they are a part." *Markman,* 52 F.3d at 979 (citing *Autogiro,* 384 F.2d at 397)); *see also SRI Intern. v. Matsushita Elec. Corp. of Am.,* 775 F.2d 1107, 1121 (Fed.Cir.1985). Section 112 of Title 35 of the United States Code provides:

> The specification shall contain a written description of the invention, and of the manner and process of making and using it, in such full, clear, concise, and exact

---

**9.** A patent claim typically has three parts: the preamble, the transition, and the body. *See* Donald S. Chisum, Patents § 806(1)(b) (1997). The preamble is an introductory phrase summarizing the invention, its relation to the prior art, or its intended use or properties. The transition is a phrase connecting the preamble to the body of the claim. The body consists of a recitation of the elements and limitations that "define the product or process to be encompassed within the patent." *Id.*

**10.** The case law is unclear whether non-technical terms should be interpreted in accordance with their common meanings or whether such terms should instead be interpreted in accordance with their meanings as understood by a person reasonably skilled in the art. The better rule is the former; non-technical terms should be given their common meaning absent evidence that they should be interpreted differently. The issue remains, however, as to whether a particular term is a "technical term."

terms as to enable any person skilled in the art to which it pertains, or with which it is most nearly connected, to make and use the same, and shall set forth the best mode contemplated by the inventor of carrying out his invention.

35 U.S.C. § 112. The specification is "highly relevant to the claim construction analysis" because it contains a written description of the invention that must be clear and complete enough to enable those of ordinary skill in the art to make and use it. *Vitronics,* 90 F.3d at 1582.

■■■■ The specification must be reviewed "to determine whether the inventor has used any terms in a manner inconsistent with their ordinary meaning." *Vitronics,* 90 F.3d at 1582; *CVI/Beta Ventures,* 112 F.3d at 1153. In this regard, the specification "may act as a sort of dictionary, which explains the invention and may define terms used in the claims." *Markman,* 52 F.3d at 979. It acts as a dictionary when it "expressly defines terms used in the claims or when it defines terms by implication." *Vitronics,* 90 F.3d at 1582.

■■■■ The specification "does not delimit the right to exclude. That is the function and purpose of the claims." *Markman,* 52 F.3d at 980. In addition, "references in the specification to a preferred embodiment, or an illustrative example, do not limit the scope of the patent claim." *Lucas Aerospace,* 890 F.Supp. at 332.

c. *The Prosecution History*

■■■ When construing the language of a claim, the prosecution history of the patent also should be considered, provided that it is in evidence. *Southwall Technologies, Inc. v. Cardinal IG Co.,* 54 F.3d 1570, 1576 (Fed. Cir.), *cert. denied,* 516 U.S. 987, 116 S.Ct. 515, 133 L.Ed.2d 424 (1995); *Markman,* 52 F.3d at 980; *Vitronics,* 90 F.3d at 1582 (citing *Graham v. John Deere,* 383 U.S. 1, 86 S.Ct. 684, 15 L.Ed.2d 545 (1966)); *CVI/Beta Ventures,* 112 F.3d at 1155. The prosecution history "contains the complete record of all the proceedings before the Patent and Trademark Office, including any express representations made by the applicant regarding the scope of the claims." *Vitronics,* 90 F.3d

at 1582. It is "often of critical significance in determining the meaning of the claims." *Id.*

■■■■ The prosecution history "limits the interpretation of claim terms so as to exclude any interpretation that was disclaimed during prosecution." *Southwall,* 54 F.3d at 1576; *see CVI/Beta Ventures,* 112 F.3d at 1155. However, the prosecution histories "cannot enlarge, diminish, or 'vary' the limitations in the claims." *Markman,* 52 F.3d at 980 (quoting *Goodyear Dental Vulcanite Co. v. Davis,* 102 U.S. 222, 227, 26 L.Ed. 149 (1880)).

In the instant action, the parties agree there is no relevant prosecution history that would be instructive in interpreting the disputed claims because the United States Patent and Trademark Office accepted all the claims without objection or amendment. *See* Brief—Cleanox at 3, 5; *Markman* Hearing Transcript at 62:10–12.

2. *Extrinsic Evidence*

■■■■ Extrinsic evidence is "all evidence external to the patent, including expert and inventor testimony, dictionaries, and learned treatises." *Markman,* 52 F.3d at 979, 980; *see Hormone Research Found.,* 904 F.2d at 1562. This type of evidence may be consulted during construction of a claim to assist with the understanding of "scientific principles, the meaning of technical terms, and terms of art that appear in the patent and prosecution history." *Markman,* 52 F.3d at 980; *see Vitronics,* 90 F.3d at 1584. In addition, extrinsic evidence may be received to aid in " 'coming to a correct conclusion' as to the true meaning of the language employed' in the patent." *Markman,* 52 F.3d at 979 (citations omitted). Moreover, if, after consideration of all available intrinsic evidence, there still is some genuine ambiguity in the claims, extrinsic evidence may be consulted to interpret the meaning of the language used in the claim. *See Vitronics,* 90 F.3d at 1584. Extrinsic evidence cannot be used, however, for the purpose of varying or contradicting the terms of the claims. *See id.*

*ANALYSIS*

### A. Claim Construction of Claim One of the '141 Patent and Claim One of the '483 Patent

The preambles of Claim One of the '141 Patent and Claim One of the '483 Patents are identical. *See* '141 Patent at col. 8, lines 23–26; '483 Patent at col. 9, lines 33–36. In addition, sub-part (a) of Claim One of the '141 Patent and sub-part (a) of Claim One of the '483 Patent are identical. *See* '141 Patent at col. 8, lines 28–29; '483 Patent at col. 9, lines 37–38. The parties appear to agree on the interpretation of the preambles, which reads from the beginning of the claim up to the colon. *See* Brief—Cleanox at 3; Brief—Defendants at 6. The parties also appear to agree that the words in sub-part (a) of Claim One of each patent, "providing a plurality of mutually spaced wells intersecting said groundwater," must be construed to mean physically providing at least two wells. *See* Brief—Defendants at 6; *Markman* Hearing Transcript at 65:3–9.

As mentioned, however, the following issues are disputed by the parties: (1) the meaning of the term "well" in Claim One of the '141 Patent and Claim One of the '483 Patent, (2) whether Step B of Claim One of the '141 Patent requires that pH be monitored for a particular purpose, (3) whether the term "treating flow" in Step C of Claim One of the '141 patent requires a "pressure limitation" and permits "bioremediation," and (4) whether Claim One of the '483 Patent requires that each of its steps be performed separately and sequentiality in order to practice the invention. *See* Brief—Cleanox at 3 n. 1; Brief—Defendants at 6 n. 1 and Exhibits C and D thereto; 18 December 1997 Letter.

After briefs were requested and received, reply briefs were sought from the parties. In their briefs and at the *Markman* Hearing, the parties advised that extrinsic evidence need not be considered to properly construe the meaning of Claim One of the '141 Patent and Claim One of the '483 Patent. *See*

Brief—Cleanox at 3; Brief—Defendants at 8–10. Nevertheless, the parties cited extrinsic evidence in their briefs. When offered a hearing on the construction issues, the parties stated that they did not believe one was necessary but welcomed the opportunity to address these issues. *See supra,* note 3. Accordingly, each party was permitted to present testimony and arguments at the *Markman* Hearing.

### 1. Construction of the Claim Term "Well" in the '141 Patent and in the '483 Patent

The term "well," in both its singular and plural forms, appears in Steps A–C of the '141 Patent and the '483 Patent. *See* Claim One of the '141 Patent; Claim One of the '483 Patent. The term, however, is not expressly defined in the claims or in the specifications (the "Specification" or the "Specifications") of either patent. *See id.* The parties appear to agree the term does not have a specialized meaning. Cleanox contends the term should be construed in accordance with its ordinary meaning, as interpreted by one reasonably skilled in the art. *See* Brief—Cleanox at 4–5; Reply Brief—Cleanox at 3. Defendants argue the construction should be based upon the intrinsic evidence of the public record. Brief—Defendants at 6–10.

### a. The Cleanox Argument

Cleanox contends the term "well" is a common English term and should be defined as "any device that allows access to groundwater." Brief—Cleanox at 4; *see Markman* Hearing Transcript at 64:8–10; 67:5–10. In support of its position, Cleanox cites the deposition testimony of an expert for the Defendants, Dr. Piotrowski, who testified that "a well usually means a device that allows access to groundwater." *Id.* (citing deposition transcript of Piotrowski at 67).[11] In addition, Cleanox asserts that Webster's Ninth New Collegiate Dictionary definition[12]

---

11. Dr. Piotrowski asserted that the standard meaning of the term "well" should not be used for claim construction purposes. *See* Brief—Cleanox at 4 n. 4.

12. According to Cleanox, Webster's Ninth New Collegiate Dictionary defines the word "well" a "a pit or hole sunk into the earth to reach a supply of water." *See id.* at 5 n. 5.

of the term is consistent with its own. *See id.* at 5 n. 5.

Cleanox argues that, although it is possible for a "well" to perform two functions, i.e., "both to withdraw material and input material," *id.* at 5, it is properly defined as "any device that allows access to groundwater." *See id.* at 4 and unnumbered page 5 of Tab A thereto; *see also Markman* Hearing Transcript at 64:17–65:1, 67:15–68:1. Cleanox cites certain portions of the Specification as support for its interpretation because the Specification utilizes permissive language such as the word "can" in at least one place when discussing the possible uses for a well, namely withdrawing and/or inputting material.[13] *See* Brief—Cleanox at 5. As such, Cleanox contends the interpretation by the Defendants of the term as requiring both "monitoring and injecting the groundwater" to practice the invention improperly reads limitations from the preferred embodiment into the claims. *See id.* at 3; Reply Brief—Cleanox at 3.

#### b. *The Defense Argument*

Defendants contend the Cleanox definition of the term "well" is too narrow. *See* Brief—Defendants at 8. They assert the proper definition should be "a structure used for both monitoring and injecting the groundwater." *Id.* at 6–10. In support of this definition, and to counter that portion of the Piotrowski deposition testimony upon which Cleanox relies, Defendants also cite a portion of Piotrowski deposition wherein Dr. Piotrowski states that, in the context of patents, the term "well" means a device that provides the dual purpose of enabling both monitoring and injecting of groundwater. *See* Reply Brief—Defendants at 2–3 (citing deposition transcript of Piotrowski at 80–81).

The Defendants reason the term "well" must contemplate a device to allow more

than a limited "access" only to remove groundwater as Cleanox contends. Defendants argue the Specification uses the term "borehole" when referring to a hole in the ground that allows withdrawal access to groundwater. *See* Brief—Defendants at 7–9. In addition, Defendants argue the Cleanox definition is overly narrow because the Specification indicates that a "well" is comprised of more structural elements than simply a "borehole." *See id.* at 8. In support of this assertion, Defendants point to the description in the Specification of a "well" which indicates that it contains at least a well casing, seal, slotted well screen, sand/gravel pack, and injection string, in addition to the borehole itself. *See id.* at 8.

Defendants further argue the patent requires the well to be used for *both* "monitoring and injecting." *See id.* at 9. As support, they cite numerous portions of the Specification that refer to the wells as both "monitoring and injecting wells." *See id.* at 9–10 (citing '141 Patent at col. 5, line 35, wells 12, 14, 16, and 18). For example, Defendants point to Figure 3 which is described as "a schematic cross-sectional view through a representative monitoring end [sic] injection well of the types utilized in [Figures 1 and 2]." '141 Patent at col. 5, lines 22–25. Defendants contend that, because the Specification indicates the wells have dual functions, the term must be read to require both "monitoring and injecting." Brief—Defendants at 10. Finally, Defendants argue that in order for the invention to be practiced, a "well" must enable both a "monitoring flow" to be withdrawn from it and a "treating or test flow" to be injected into it. *Id.* at 10.

#### c. *Judicial Construction*[14] *of the Term "Well"*

Although both parties refer to certain extrinsic evidence in their briefs to support their respective interpretation of the

---

13. The Specification states, in relevant part, that "[i]t will be appreciated that a monitoring flow can be withdrawn from the well, as can a treating or test flow be injected via the well into the groundwater into which the well intersects." See '141 Patent at col. 6, lines 20–24.

14. A trial judge has an independent obligation to determine the meaning of the claims, regardless

of the arguments advanced by the parties. A "judges task is not to decide which of the adversaries is correct." *Lubrizol*, 64 F.3d at 1556. The positions of Cleanox and the Defendants have been set out to give context; the declaration of the meaning of the claims at issue is the result of an independent assessment following review of the submissions and arguments of counsel.

term "well" (e.g., a dictionary and expert testimony), they nevertheless state that the meaning of the term can be determined by examining only the intrinsic evidence. The parties have stated as much in their briefs and their 8 October 1997 letters to the Court. *See* Cleanox's and Defendants' 8 October 1997 Letters; *see also Markman* Hearing Transcript at 72:19–23; Brief—Cleanox at 4–5; Brief—Defendants at 7.

The words of the claim themselves, and as used in the Specification, adequately describe the scope of the term "well." There is no ambiguity as to the meaning of the term. Accordingly, extrinsic evidence is neither necessary nor appropriate to construe its meaning. *Cybor Corp.*, 138 F.3d at 1454; *Vitronics*, 90 F.3d at 1576. In addition, because the term "well" is not defined in Claim One in either patent, the Specification may be used as a dictionary to explain the invention and interpret the claims. *See Markman*, 52 F.3d at 979; *Vitronics*, 90 F.3d at 1582. When using the specification to define a term in the claim, however, it is recognized "[t]here is a fine line between the use of the specification to clarify otherwise cloudy terms in the claim and the extraction of limitations from the specification to impose those limitations on the claim." *CCPI v. American Premier, Inc.*, 966 F.Supp. 276, 282 (D.Del.1997) (citing *CVI/Beta Ventures, Inc. v. Tura, L.P.*, 112 F.3d 1146, 1158 (Fed. Cir.1997); *Electro Med. Sys., S.A. v. Cooper Life Sciences, Inc.*, 34 F.3d 1048, 1054 (Fed. Cir.1994); *In Re Van Geuns*, 988 F.2d 1181, 1184 (Fed.Cir.1993); *Intervet Am., Inc. v. Kee–Vet Labs., Inc.*, 887 F.2d 1050, 1053 (Fed.Cir.1989)).

The term "well" in Claim One of the '141 Patent and in Claim One of the '483 Patent should be, and is, read as a structure which enables both monitoring and injecting groundwater; that is a device to both withdraw and input. The Description of Preferred Embodiment for each of the patents at issue consistently describes the wells as having a dual purpose, for "monitoring and injecting." *See, e.g.,* '141 Patent at col. 5,

lines 22–25; col. 5, line 35; col. 5 line 54; '483 Patent at col. 6, lines 53–54; col. 7, line 5–6. Indeed, each of the patents refer to the well depicted in Figure 3 as a "monitoring and injection well." *See, e.g.,* '141 Patent at col. 5, line 54–55; '483 Patent, at col. 7, lines 5–6. Although nothing in the Specification requires that the wells be used for both purposes, implicit in Claim One of the '141 Patent and Claim One of the '483 Patent is the requirement that the wells be used in such a fashion.

A review of the language used in Claim One of the '141 Patent reveals the term well must be read as a device having a dual purpose enabling one to inject or withdraw. For example, Step A of the '141 Patent uses the language "a plurality of mutually spaced wells intersecting said groundwater region." Step A of the '141 Patent; *see* Step A of the '483 Patent. There must be a purpose for such language. This purpose is revealed in the remaining steps of the '141 Patent.[15]

In order to determine the existence of acceptable continuity and well interflow paths, as required by Step B of the '141 Patent, a practitioner is to practice the invention by

> *generating* a test flow of a solution of hydrogen peroxide from one of said wells and *monitoring* pH changes at each other of said wells as a function of time to detect a pH drop of at least 0.2; and (c) subsequent to *detecting* said pH drop, *providing* a treating flow of said hydrogen peroxide solution from one or more of said wells.

Step B and Step C of the '141 Patent (emphasis added).

Construction of this language reveals a practitioner must use this plurality of mutually spaced wells to inject or generate a test flow and withdraw a sample to monitor or detect a pH change and then inject or provide a treating flow from one or more of said wells. A review of the Specifications of the '141 Patent and the '483 Patent reveals the inventor did not use the term well in a

---

**15.** As noted, the '483 Patent results from a "continuation-in-part application filed in the application resulting in the '141 Patent." *See supra* note 1 (quoting Brief—Defendants at 16–17 n. 3).

Significantly, neither Cleanox nor the Defendants suggests "wells" should be construed differently in the '483 Patent.

manner inconsistent with the ordinary meaning of that term, as construed in this opinion.

In the '141 Patent in the section entitled "Summary of Invention" the implicit dual use of the wells becomes apparent. For example, it is stated:

> Pursuant to the invention, a plurality of mutually spaced wells are provided by sinking same into the groundwater region, with which the bottoms of the wells intersect so as to provide a means for *injection* of the reactants used in the invention. In the course of practicing the invention, a treating flow of hydrogen peroxide is *provided* from one or more of the wells. Periodically the treating flow is *stopped* and a *determination* made of the hydro carbon contaminant levels at each said well.

'141 Patent at col. 3, lines 1–10 (emphasis added).

> In a preferred mode of practicing the present invention, the existence of acceptable continuity and well interflow paths for the *groundwater region to be treated is established* by initially *generating* a test flow of a solution of hydrogen peroxide from one of the wells and *monitoring* the pH changes at each other of the wells as a function of time.

*Id.* at col. 3, lines 52–58 (emphasis added).

> Subsequent to *detecting* the said pH drop a treating flow of the hydrogen peroxide solution is then *provided* from one or more of the wells. The treating flow is again periodically *stopped* and the hydro carbon contaminant levels *measured* at each well for . . . .

*Id.* at col. 3, line 67 to col. 4 line 3 (emphasis added).

> In typical treatment arrangements pursuant to the invention at least three *injection wells* are utilized which are separated about the periphery of the groundwater region to be treated. The test flow is *injected* at one of said well and the pH changes are *monitored* at the other said well.

*Id.* at col. 4, lines 47–53 (emphasis added).

The Summary of Invention in the '141 Patent also addresses the concept of, from time-to-time, the injection or monitoring

through these wells. *See, e.g.,* '141 Patent at col. 4, line 6 to col. 5, line 4.

The Summary of Invention section of the '483 Patent is no less specific in referring to the wells as injection and monitoring wells.

> Pursuant to the invention a plurality of mutually spaced wells are provided which intersect the groundwater region. A treating flow of acidic acid is *provided* from one or more of the wells into the groundwater region, to establish acidic conditions therein. A turbulent flow of an aqueous solution of ferrous ion is *introduced* into the groundwater region, for mixing the acidified water, thereby *providing* a catalyst for disassociation of hydrogen peroxide. A treating flow of hydrogen peroxide solution is then *provided* for one or more of the wells into the groundwater region, the hydrogen peroxide undergoing a Fenton-like reaction in the presence of the acidic conditions and ferrous ion to generate hydroxyl free radicals for oxidizing the contaminants.

> . . . The existence of acceptable continuity and well interflow paths for the region are *determined* by *monitoring* pH changes at each other of said wells as a function of time to detect a pH drop of at least 0.2.

'483 Patent at col. 3, lines 9–27 (emphasis added).

> [C]omprising the steps of: providing a plurality of mutually spaced wells intersecting said static plume groundwater; *measuring* the change in water depth at each of said wells following atmospheric precipitation, to determine by common depth changes the likelihood of said plume; confirming the existence of the static plume by *generating* a test flow of a solution of hydrogen peroxide or acidic acid from one of said wells and *monitoring* the absence of pH changes at each other of said wells as a function of time; and *providing* a treating flow of solutions of acidic acid, of ferrous ion, and of hydrogen peroxide from each of said wells to establish a radial sweep about each said well, . . . .

*Id.* at col. 3, line 61 to col. 4, line 5 (emphasis added).

In a preferred mode of practicing the present invention, the existence of acceptable continuity and well interflow paths for the groundwater region to be treated is established by initially *generating* a test flow solution of hydrogen peroxide from one of the wells and *monitoring* the pH changes at each other of the wells as a function of time. A pH drop of at least 0.2 is considered to be indicative of satisfactory conditions.... Subsequent to *detecting* the said pH drop, a treating flow of hydrogen peroxide solution is then *provided* for one or more of the wells. The treating flow is again periodically *stopped* and the hydrocarbon contaminant levels *measured* at each well until the initial concentration levels drop below predetermined acceptable values.

*Id.* at col. 5, lines 3–22 (emphasis added). The dual purpose of the wells contemplated in the '483 Patent is also demonstrated in other areas of the section entitled Summary of Invention. *Id.* at col. 5, line 36 to col. 5, line 29.

A review of the language which precedes Claim One in each of the patents demonstrates that the "plurality of mutually spaced wells" referred to in sub-part (a) in Claim One of each of the patents refers to a dual purpose well. Moreover, each of the patents refers to the wells as "monitoring and injecting wells." *See, e.g.,* '141 Patent at col. 5, line 35; col. 5, line 54; '483 Patent at col. 6, lines 53–54; col. 7, line 5.

If a practitioner were using the wells solely for injecting the treating flow, he or she would not know which of the plurality of wells to use to inject the flow. Only use of the well or wells for monitoring can lead to the selection of the correct well or wells for injecting. Conversely, if a practitioner were using the wells only for monitoring a flow, he or she could not to treat the site. Finally, the Specification also supports the Defendants' definition of the term because the Specification indicates that a "borehole," and not a "well," is the device that simply provides access to water. *See* '141 Patent at col. 5, line 55; '483 Patent at col. 7, line 6. A "well," on the other hand, must perform other functions in light of its many different structural elements, as intended by the '141 Patent and the '483 Patent.

Each reference to the Specifications for the '141 Patent and the '483 Patent reinforces a natural reading of the term "well." The Specifications have been used solely to provide a context and to sharpen the construction of the claim language.

### 2. Construction of Step B of '141 Patent

The parties dispute whether Step B of the '141 Patent requires that pH be monitored for a particular purpose.

#### a. The Cleanox Argument

Cleanox argues that Step B of '141 Patent "does *not* require that the practitioner have any specific purpose or intent in monitoring pH." Reply Brief—Cleanox at 4 (emphasis in original). The practitioner's intent during monitoring, Cleanox argues, is irrelevant to an infringement analysis if the practitioner practices what Step B of '141 Patent teaches. *See id.* (citing *Hilton Davis Chem. Co. v. Warner–Jenkinson Co.,* 62 F.3d 1512, 1519 (Fed.Cir.1995), *rev'd on other grounds,* 520 U.S. 17, 117 S.Ct. 1040, 137 L.Ed.2d 146 (1997)). Cleanox contends, therefore, that any monitoring of pH by a practitioner infringes Step B of the '141 Patent. *See id.*

#### b. The Defense Argument

Defendants argue Step B of '141 Patent expressly requires "the pH be monitored for the particular purpose of determining the existence of acceptable continuity and well interflow paths." Reply Brief—Defendants at 3. They argue the reliance by Cleanox on the testimony of Dr. Piotrowski to interpret the meaning of Step B of the '141 Patent is misplaced because, among other things, it is extrinsic evidence. *See id.* at 4. Finally, in an effort to avoid jury confusion, Defendants seek a ruling that Step B of the '141 Patent requires all of the following:

1) generating a test flow of a solution of hydrogen peroxide from one of the wells provided in the step of subpart(a);

2) monitoring the other wells provided in the step of subpart(a) to detect a pH drop of at least 0.2; and

3) using the detected pH drop of at least 0.2 for the express purpose of determining that continuity and well overflow paths are acceptable to receive the treating flow.

*See id.* at 4 n. 1; *see also* Brief—Defendants at 11.

#### c. *Judicial Construction*

■■■ The express language of Step B of the '141 Patent requires that the pH be monitored to "determin[e] the existence of acceptable continuity and well interflow paths." Step B of the '141 Patent. The reliance by Cleanox on extrinsic evidence, such as the testimony of Dr. Piotrowski, to construe the meaning of Step B of the '141 Patent is unnecessary for the reasons previously discussed in this Supplemented Opinion. Although Cleanox correctly states that the intent of a practitioner while practicing the invention is not a proper element of patent infringement, here the intent of the practitioner is not analyzed. Rather, the patent claim itself is construed to determine whether it discloses a purpose for the pH monitoring. As mentioned, the language of Step B of the '141 Patent expressly teaches the purpose of such monitoring is to "determin[e] the existence of acceptable continuity and well interflow paths." Step B of the '141 Patent. Finally, Step B of the '141 Patent should be read to require all of the following:

1) generating a test flow of a solution of hydrogen peroxide from one of the wells provided in the step of subpart(a);

2) monitoring the other wells provided in the step of subpart(a) to detect a pH drop of at least 0.2; and

3) using the detected pH drop of at least 0.2 for the express purpose of determining that continuity and well overflow paths are acceptable to receive the treating flow.

#### 3. *Construction of the Claim Term "Treating Flow" in Step C of the '141 Patent*

Step C of the '141 Patent requires the practitioner to provide "a treating flow of said hydrogen peroxide from one or more of said wells" after a drop in the pH level is detected. '141 Patent, at col. 8, line 36–38. There are two disputes between the parties as to the meaning of "treating flow": whether the term "treating flow" includes a pressure limitation; and whether the term "treating flow" includes the practice of bioremediation.

#### a. *Whether "Treating Flow" Includes a Pressure Limitation*

#### 1. *The Cleanox Argument*

Cleanox argues the treating flow requirement should not be limited to a particular pressure range. *See* Brief—Cleanox at 6; *Markman* Hearing Transcript at 68:17–25. Instead, it contends that only claim 4 of the '141 Patent ("Claim Four of the '141 Patent")[16] should be read to have such a limitation because it alone contains an express pressure limitation. *See* Brief—Cleanox at 6. Cleanox argues that, under the doctrine of claim differentiation (the "Claim Differentiation Doctrine"),[17] Claim Four of the '141 Patent is dependant on Claim One of the '141 Patent and therefore its limitations should not be read into Claim One of the '141 Patent. *See id.* Cleanox states Claim One of the '141 Patent cannot have a pressure limitation because it must be broader in scope than Claim Four of the '141 Patent which has such a limitation. *See id.*

#### 2. *The Defense Argument*

The Defendants assert "treating flow" incorporates a maximum pressure limitation that is based upon the depth of the well. *See* Brief—Defendants at 18 (citing '141 Patent

---

16. Claim Four of the '141 Patent provides that "the treating flow is provided under a pressure not more than the hydrostatic head relative to surface at the point of treating flow discharge from said well." Claim Four of the '141 Patent.

17. The Claim Differentiation Doctrine holds that narrow claim limitations cannot be read into

broader ones to limit the meaning of the broader claim because each claim is distinct from other claims within the patent. *See Transmatic, Inc. v. Gulton Indus., Inc.*, 53 F.3d 1270, 1277 (Fed.Cir. 1995) (citing *D.M.I., Inc. v. Deere & Co.*, 755 F.2d 1570, 1574 (Fed.Cir.1985)).

at col. 4, lines 9–12). They argue that, based upon the language of the Specification, this limitation should be "not more than the hydrostatic head relative to the ground surface at the point of discharge from the well." *See id.* at 12 (quoting col. 4, line 9–12 of the '141 Patent).

The Defendants assert the pressure limitation is applicable to all of the claims, including Claim One of the '141 Patent, because the Specification does not qualify or restrict the limitation in any way. *See id.* at 19. In further support of their argument, the Defendants contend the Specification warns the practitioner that, if the pressure limitation is exceeded, reactants may pass upwardly out of the ground and create undesirable conditions. *See id.* (quoting '141 Patent at col. 4, lines 12–15). The Defendants dismiss reliance on the Claim Differentiation Doctrine by arguing that the Specification trumps the Claim Differentiation Doctrine because it provides a clear meaning for the language of the claim. *See id.* at 20 (citing *O.I. Corp. v. Tekmar Co.*, 115 F.3d 1576 (Fed.Cir.1997)).

### 3. *Judicial Construction*

 The Claim Differentiation Doctrine requires each claim be distinct from the others such that the limitations of a dependent claim should not be read into an independent claim. *See Laitram Corp. v. Rexnord, Inc.*, 939 F.2d 1533, 1538 (Fed.Cir. 1991) (quoting *Autogiro Co. of Am. v. United States*, 181 Ct.Cl. 55, 384 F.2d 391, 404 (1967)). Narrow claim limitations cannot be read into broader ones because each claim is distinct from the other claims within the patent. *See Transmatic*, 53 F.3d at 1277 (citing *D.M.I., Inc. v. Deere & Co.*, 755 F.2d 1570, 1574 (Fed.Cir.1985)).

 Because Claim Four of the '141 Patent contains a pressure limitation, Claim One of the '141 Patent, upon which Claim Four of the '141 Patent is dependent, by definition, is broader in scope and cannot contain such a limitation. *See Transmatic*, 53 F.3d at 1277–78. The language of the Specification cited by the Defendants is identical to that contained in Claim Four of the '141 Patent. *See* '141 Patent at col. 8, lines 50–52. Accordingly, to read Claim One of the '141 Patent as having the same scope as Claim Four of the '141 Patent would make Claim Four of the '141 Patent superfluous. *See Lucas Aerospace*, 890 F.Supp. at 332. In addition, the language of the Specification demonstrates a pressure limitation *may*, but is not required to, be employed. The Specification states: "[I]f the pressure exceeds this [limitation], it is *possible* for some of the reactants to pass upwardly through the porous overburden and create undesirable conditions on the ground surface." '141 Patent at col. 4, lines 9–15 (emphasis added). Although the method contemplates the pressure may be limited, in some circumstances it may be possible to apply a greater or lesser pressure without adverse effects. Therefore, for purposes of Claim One of the '141 Patent, it is not appropriate to limit "treating flow" to a particular pressure range.

### b. *Whether "Treating Flow" Includes Bioremediation*

### 1. *The Cleanox Argument*

Cleanox argues that chemical remediation [18] is the sole subject of both the '141 Patent and the '483 Patent. *See* Brief—Cleanox at 6. Cleanox contends "treating flow" should not be read so broadly to include the prior art "bioremediation [19] method." *Id.* at 6. Instead, it argues the term should be interpreted as a "flow of hydrogen peroxide that is in keeping with the 'chemical reaction' remediation process set out in the patent." *Id.* at 8.

In support of its position, Cleanox points to the Specification which reveals that the patentee distinguished the bioremediation method as a prior art that he believed was ineffec-

---

**18.** Chemical remediation is a method involving a chemical reaction between the hydrogen peroxide and the hydrocarbon contaminants. *See* Brief—Cleanox at 6.

**19.** Bioremediation is a method whereby hydrogen peroxide is introduced into the ground to "feed" microbial life near the contamination. Microbial life then "eats" the hydrocarbon. *See* Brief—Cleanox at 6. Both parties recognize the distinction between bioremediation and chemical remediation.

tive. *See* Brief—Cleanox at 6. For example, the Specification provides:

> In recent years increasing interest has also been evidenced in bioremediation technology. The technology has been of great interest, but its effective use in treating groundwater has been limited. The procedures are very complex, involving the use of expensive and complex reactors, and can cause adverse geochemical reactions, and can even introduce new toxic compounds beyond those which are being treated.

'141 Patent at col. 1, line 63 to col. 2, line 2. Accordingly, Cleanox argues that "[i]t would be contrary to the central teaching of the Specification to read Claim One [of the '141 Patent] as covering this prior art technique that the inventor expressly discounts." Brief—Cleanox at 7.

Cleanox finds additional support for its position in another part of the Specification that states:

> The treating flow may additionally contain reaction surface enhancing reagents, i.e. reagents such as dispersions of lime or the like, which provide increase or provide surfaces *at which the reaction between the hydrogen peroxide and the hydrocarbon contaminants may occur.* Similarly, effective amounts of catalytic agents may be incorporated into the treating solution or preferably are provided as a preinjection into the groundwater region to be treated. Typical such catalysts are initiation catalysts of various types known in the art to promote the desired reaction between the hydrogen peroxide and hydrocarbons.

Brief—Cleanox at 7 (quoting '141 Patent at col. 3, lines 22–24) (emphasis added in Brief—Cleanox). Cleanox argues the emphasized language makes it clear that "the treating flow of hydrogen peroxide must result in a chemical reaction between the peroxide and the hydrocarbon contaminants." *Id.* at 7.

### 2. The Defense Argument

The Defendants argue "treating flow" includes both bioremediation and chemical remediation methods. *See* Brief—Defendants at 13. The Defendants point out there

are no words in the claim or Specification which indicate "treating flow" is limited solely to chemical remediation. *See id.* Similarly, the Defendants argue that the preamble of Claim One of the '141 Patent generically states the claim is directed to "[a] method for remediating ...," rather than a method for "chemically remediating." *Id.* In addition, Defendants point to the Background of the Invention portion of the Specification of Claim One of the '141 Patent which the Defendants contend "explains that the remediation of hydrocarbons can be accomplished through either chemical remediation (see ['141 Patent at] col. 2, line 9,) or biological remediation (see ['141 Patent at] col. 1, line 64)." *See* Brief—Defendants at 13.

The Defendants also assert that, if the interpretation argued by Cleanox were to be accepted, the scope of Claim One of the '141 Patent will become indefinite and unclear because there is no explanation in the patent to explain how a person can practice the invention in a manner which causes chemical rather than biological remediation. *See* Brief—Defendants at 14. As such, Defendants argue such an interpretation would violate 35 U.S.C. § 112, which requires the patent to include claims "particularly pointing out and distinctly claiming the subject matter which the applicant regards as the invention." Brief—Defendants at 14 (quoting 35 U.S.C. § 112).

### 3. Judicial Construction

The Specification in each of the '141 Patent and the '483 Patent discusses the limitations of the bioremediation technology, as a prior art, which the inventor viewed as ineffective and over which he saw his invention as an improvement. *See* '141 Patent at col. 1, line 63 to col. 2, line 2; '483 Patent at col. 2, line 1 to line 8. The Federal Circuit has indicated that "where a term is susceptible to two reasonable interpretations, the court can look to prior art" to assist it in construing the patent claims. *Elf Atochem North Am., Inc.,* 894 F.Supp. at 859 (citing *Rawlplug Co. v. Illinois Tool Works, Inc.,* 11 F.3d 1036, 1041 (Fed.Cir.1993)); *Texas Instruments, Inc. v. United States ITC,* 871 F.2d 1054, 1065 (Fed.Cir.1989). The claims

then should be interpreted to exclude the prior art and thus preserve the validity of the claim. *Texas Instruments*, 871 F.2d at 1065. The claims are interpreted as excluding the prior art.

There are numerous references to chemical reactions throughout the Specifications which support the conclusion that the patents contemplate chemical remediation. For example, the terms "Treatment chemicals," "reaction" and "reactants" are used in the summary of invention portion of the Specifications. *See, e.g.*, '141 Patent at col. 2, lines 9, 48 and 49; col. 3, line 16 and line 33, col. 4, line 13; '483 Patent at col. 2, lines 14, 57, 64 and 65 (Fenton's reaction); col. 3, line 20; col. 4, lines 7, 19, 36, and 48; col. 5, lines 11 and 13; col. 6, lines 8 and 20. The terms also are used in the description of the preferred embodiment. *See id.* at col. 7, line 2, 5 and 9. Similarly, use of the terms "catalyst" and "catalytic agents" throughout the Specifications further demonstrates that the '141 Patent and the '483 Patent contemplate chemical remediation. *See id.* at col. 3, lines 18, 21 and 27; col. 6, line 44; '483 Patent at col. 3, line 16; col. 7, lines 58, 66 and 67; col. 8, line 23.

### 4. *Sequentiality of Steps in Claim One of '483 Patent*

The parties also dispute the scope of Claim One of the '483 Patent. *See* Brief—Defendants at 26. In particular, the parties dispute whether each step of the '483 Patent must be performed separately and sequentially.[20] *Id.*

#### a. *The Cleanox Argument*

Cleanox asserts that Claim One of the '483 Patent neither requires Steps A–D to be performed separately nor prohibits the simultaneous performance of them. *See* Brief—Cleanox at 8.

Cleanox contends that Steps A–D of the '483 Patent need not be performed in sequence. *See* Reply Brief—Cleanox at 6.

In support of its position that Steps A–D of the '483 Patent need not be performed in sequence, Cleanox argues that, with the exception of Step C of the '141 Patent, no sequencing language is located in the claim. *See* Reply Brief—Cleanox at 6. In addition, Cleanox argues reliance by the Defendants on the language of the Specification to find sequential limitations improperly ignores the plain meaning of the claim in favor of adding limitations to the claim from the preferred embodiment. *See id.* at 7.

In support of its position that Steps A–D can be performed simultaneously, Cleanox points to Figure 3 of the '483 Patent. *See id.* Cleanox argues that Figure 3 depicts the various components of the treating solution, i.e., acid, ferrous ion, and hydrogen peroxide, being simultaneously connected to the well. *See id.* at 8. Cleanox also argues a portion of the Specification supports its position that the components of the treating flow can be simultaneously injected into the well. For example, Cleanox contends the portion of the Specification which states, "providing a treating flow of solutions of acetic acid, of ferrous ion, and of hydrogen peroxide from each of said wells," contemplates a treating flow composed of solutions of all three chemical elements. *Id.* at 8 (quoting '483 Patent at col. 4, lines 2–5).

Cleanox further contends Claim 4 of the '483 Patent ("Claim Four of the '483 Patent") supports its position that Steps A–D of the '483 Patent *can*, but are not required to, be performed simultaneously. *See id.* at 8. Claim Four of the '483 Patent provides:

A method in accordance with [C]laim [One], wherein between steps (b) and (c) and between steps (c) and (d) potable water is injected from the same said wells in place of acetic acid and ferrous ion solutions, to provide a transient buffer zone between the compositions introduced during steps (b), (c) and (d), thereby delaying the reaction of step (d) until the plum of

---

20. At the *Markman* Hearing, the parties raised for the first time a dispute whether the Steps A–C of Claim One of the '141 patent must be performed (1) in sequence and (2) separately. The parties did not brief this issue. After brief argu-ments, however, both parties agreed that Steps A–C of Claim One of the '141 need to be performed sequentially. *See Markman* Hearing Transcript at 79:21–82:2.

injected miscible reactants has extended further into said groundwater region.

Claim Four of the '483 Patent. Cleanox argues that Claim Four of the '483 Patent discloses the further invention of introducing the treating flows separately, and separating the flows with potable water. Accordingly, Cleanox argues that, based on the Claim Differentiation Doctrine, Claim One of the '483 Patent is broader than Claim Four of the '483 Patent, and Claim One of the '483 Patent therefore does not exclude the simultaneous introduction of the reagents discussed in the Steps. *See* Brief—Cleanox at 8.

b. *The Defense Argument*

Defendants argue the scope of Claim One of the '483 Patent requires Steps A–D to be performed separately and in the sequence in which they are listed. *See* Brief—Defendants at 26.

Defendants assert Cleanox agrees with them that Step A must be performed first. *See id.* at 26. Defendants then reason that Step B [21] must be performed after Step A and before Step C [22] because Step C uses the word "acidified." As such, Defendants assert that the acetic acid discussed in Step B must be injected prior to the addition of ferrous ion discussed in Step C. *See* Brief—Defendants at 27. Otherwise, the express language of the claim would be violated because the ferrous ion would not be added in such a fashion that it mixes with acidified groundwater. *Id.*

Defendants also argue that, although the words of Step D do not require that it be performed in any sequence, the Specification reveals that Step D [23] must be performed after Steps B and C. *See id.* In support of this position, Defendants point to the portion

of the Specification that states "[a] treating flow of hydrogen peroxide solution *is then provided* from one or more of the wells into the groundwater region." *Id.* (quoting '483 Patent at col. 3, line 17) (emphasis added). Defendants argue the use of the phrase "is then provided" demonstrates that the hydrogen peroxide is to be added after the ferrous ion. *Id.* at 28. Defendants also contend that another portion of the Specification provides support for its position. This language states, in relevant part, as follows:

> "[b]etween the acidification step and the introduction of ferrous ion, as well as *between* the ferrous ion introduction and the addition of hydrogen peroxide, potable water is injected ... delaying the reaction achieved in the *final step* ..."

*Id.* (quoting '483 Patent at col. 3, lines 29–36) (emphasis added). Defendants argue that the use of the words "between" and "final step" in this part make it clear that the steps are to be performed sequentially. *Id.* at 28–29.

In further support of their argument, Defendants look to Figure 3 of the '483 Patent. *See* Reply Brief—Defendants at 7. Defendants argue that Figure 3 demonstrates that only sequential injection is contemplated by the '483 Patent. *Id.* They argue that, contrary to the assertion of Cleanox, the "Quick Connect Assembly" is depicted in Figure 3 as receiving only one of the lines that is available from tanks nearby. Defendants contend this fact demonstrates that simultaneous injection is not contemplated by the patent, otherwise the Quick Connect Assembly would need to receive more than one line at a time.

c. *Judicial Construction*

 Step A must be performed first because the wells must be installed before

---

**21.** Step B requires the introduction of "a treating flow of *acetic acid* from one or more of said wells into said groundwater region, *to establish acidic conditions* therein." '483 Patent (emphasis added).

**22.** Step C requires the introduction of "a turbulent flow of an aqueous solution of *ferrous ion* into said groundwater region, for *mixing* with said *acidified* groundwater, thereby providing a catalyst for disassociation of hydrogen peroxide." '483 Patent (emphasis added).

**23.** Step D requires the introduction of "a treating flow of hydrogen peroxide solution from one or more of said wells into said groundwater region, said hydrogen peroxide undergoing a Fenton-like reaction in the presence of said acidic conditions and said ferrous ion to generate hydroxyl free radicals for oxidizing said contaminants." '483 Patent.

Steps B–D can be effectuated, otherwise there would be no way to "provide a 'treating flow'" or "introduce a turbulent flow." The parties do not appear to dispute this reading.

Step C states that ferrous ion must be "mixed" with "acidified groundwater." Step B creates the "acidified groundwater" contemplated by Step C by "providing a treating flow of acetic acid…into said groundwater." '483 Patent at col. 9, lines 39–41. The use of the term "acidi*fied* " in the past tense in Step C indicates that the "acetic acid" mentioned in Step B must be introduced *before* the addition of ferrous ion referenced in Step C. *See id.* at col. 9, lines 42–45. Moreover, the use of the term "mixing" in Step C demonstrates that the ferrous ion mentioned in Step C must be introduced *after* the groundwater has been "acidified" by Step B. The ferrous ion cannot be "mixed" with the "acidified groundwater" unless such is already in the ground. Step C does not indicate that the "mixing" of the ferrous ion and acidified groundwater can occur on the surface. Rather, it states that the flow of an aqueous solution of ferrous ion must be introduced "for mixing" with "said acidified groundwater." *See id.* at col. 9, line 43.

Step D provides "a treating flow of hydrogen peroxide solution…into said groundwater region." *See id.* at col. 9, lines 46–47. In addition, Step D states that the hydrogen peroxide undergoes a "Fenton-like reaction *in the presence of said acidic conditions and said ferrous ion.*" *See id.* at col. 9, lines 46–51 (emphasis added). As such, Step D must be performed after Steps B and C, otherwise the hydrogen peroxide could not undergo a Fenton-like reaction "in the presence of said acidic conditions and said ferrous ion."

The Specification also clearly supports the reading that Claim One of the '483 Patent is intended to be sequential. The Specification provides:

> Pursuant to the invention a plurality of mutually spaced wells are provided which intersect the groundwater region. A treating flow of acetic acid is provided from one or more of the wells into the groundwater region to establish acidic conditions therein. A turbulent flow of an aqueous solution of ferrous ion is intro-duced into the groundwater region, for mixing with the acidified groundwater, thereby providing a catalyst for disassociation of hydrogen peroxide. A treating flow of hydrogen peroxide solution is then provided from one or more of the wells into the groundwater region, the hydrogen peroxide undergoing a Fenton-like reaction in the presence of acidic conditions and ferrous ion to generate hydroxyl free radicals for oxidizing the contaminants.

'483 Patent at col. 3, lines 9–22.

*Conclusion*

For the reasons stated, the claim construction of the disputed terms is as follows: (1) the term "well" in Claim One of the '141 Patent and Claim One of the '483 Patent means "a structure used for both monitoring and injecting the groundwater," (2) Step B of the '141 Patent is read to require that pH be monitored for the particular purpose of determining the existence of acceptable continuity and well interflow paths, (3) the term "treating flow" in Step C of the '141 Patent is read to have no pressure limitation associated with it and to be limited to "chemical remediation", and (4) Claim One of the '483 Patent is read to require the performance of Steps A–D both separately and sequentially to practice the invention.